```
                                      ┌─────────────────────────────┐
                                      │ USDC SDNY                   │
                                      │ DOCUMENT                    │
                                      │ ELECTRONICALLY FILED        │
UNITED STATES DISTRICT COURT          │ DOC #: _____      │
SOUTHERN DISTRICT OF NEW YORK         │ DATE FILED: 09/19/11        │
                                      └─────────────────────────────┘
```

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

------------------------------x
                              :     11 MC 224 (LAP)
In re Fairfield Sentry Ltd.,  :     11 MC 230 (LAP)
et al. Litigation             :     11 MC 231 (LAP)
                              :     11 MC 235 (LAP)
------------------------------x     11 MC 236 (LAP)
This Document Applies To      :     11 MC 237 (LAP)
ALL ACTIONS                   :
------------------------------x     <u>Opinion & Order</u>

Loretta A. Preska, Chief United States District Judge:

      Defendants in adversary proceedings before the Bankruptcy Court moved this Court for leave to appeal from an order of the Bankruptcy Court denying Defendants' motions to remand these cases to state court or abstain from asserting jurisdiction. <u>In re Fairfield Sentry Ltd.</u> (<u>Fairfield III</u>), 452 B.R. 64, 69 (Bankr. S.D.N.Y. 2011). For the reasons set forth below, the motion for leave to appeal [dkt. no. 1] is granted.

      Following a hearing on the motion for leave to appeal, the parties agreed to use their submissions to the Bankruptcy Court on the substantive issues as their briefs on the merits of the issues in this Court if leave to appeal were granted. <u>In re Fairfield Sentry, Ltd.</u>, No. 11 MC 224 (S.D.N.Y. Aug. 22, 2011). This opinion and order also addresses Defendants' appeal of the Bankruptcy Court's order denying Defendants' motions to remand or abstain. After careful consideration of all of the parties' submissions in the Bankruptcy Court and in this Court as well as

the arguments made in the hearing before this Court, the order
of the Bankruptcy Court is reversed.

I. BACKGROUND

The facts involved in this appeal are laid out in
prior orders of the Bankruptcy Court and this Court, and the
Court assumes familiarity with those facts.  In re Fairfield
Sentry Ltd. (Fairfield I), 440 B.R. 60, 64-66 (Bankr. S.D.N.Y.
2010); In re Fairfield Sentry, Ltd. (Fairfield II), No. 10 Civ.
7340, 2010 WL 4910119, at *1 (S.D.N.Y. Nov. 22, 2011); Fairfield
III, 452 B.R. at 68-73.  The Court rehearses only the facts
germane to this appeal.

Plaintiffs, Fairfield Sentry Limited, Fairfield Sigma
Limited, and Fairfield Lambda Limited (the "Funds"), are three
Funds organized under the laws of the British Virgin Islands
("BVI").  The Funds sold shares to foreign investors and
"invested" the proceeds with Bernard L. Madoff Investment
Securities LLC ("BLMIS").  The Funds' shareholders could redeem
their shares at will.  After Madoff's fraud was exposed, the
Funds' "investments" were eviscerated.  As a result, each of the
Funds entered liquidation proceedings in either February or
April of 2009 in the BVI.

The BVI courts appointed liquidators and foreign
representatives of the Plaintiffs.  Beginning in April 2010, the
foreign representatives began filing numerous lawsuits for

Plaintiffs in the New York state courts against these and other
Defendants.  These Defendants are, generally, banks and the
unknown beneficial holders of the interests in the Funds.  Many
banks purchased shares in the Funds (and were the registered
owners) then resold them to individual clients, who were the
beneficial owners of the shares.  Plaintiffs originally made
only state-law claims for money had and received, unjust
enrichment, mistaken payment, and constructive trust.  The
theory of all of these claims, however titled, is the same:
because of Madoff's fraud, the Funds miscalculated the net asset
value ("NAV") of shares, which resulted in inflated share prices
upon redemption.  Plaintiffs challenge the transfers made to
redeem shares because the amounts paid on redemption were
allegedly too high.

On June 14, 2010, the foreign representatives
commenced an ancillary proceeding in the Bankruptcy Court under
Chapter 15 of title 11, United States Code, seeking recognition
of the BVI liquidation proceedings as "foreign main
proceedings."  11 U.S.C. §§ 1502(4), 1515.  That petition was
granted on July 22, 2010.  <u>Fairfield I</u>, 440 B.R. at 66.

After this, the foreign representatives began filing
substantially identical claims in the Bankruptcy Court rather
than in state court.  To date, over 200 substantially similar
lawsuits have been filed in the state and federal courts.  After

recognition, the foreign representatives, under 28 U.S.C.
§ 1452(a), removed the actions that had been filed in state
court to this Court, which referred them automatically to the
Bankruptcy Court.  Not all of the actions were removed
simultaneously.  Now, all of these lawsuits have been
consolidated in the Bankruptcy Court.

Before recognition, the foreign representatives
commenced in the New York state courts the 41 lawsuits against
the present Defendants, claiming over $3 billion.  These
Defendants filed the motions to remand or abstain in the
Bankruptcy Court on October 4, 2010, arguing that the Bankruptcy
Court lacked subject matter jurisdiction and that it should
abstain from hearing these cases.  In addition, certain
defendants claimed that the removal of the actions against them
was untimely.

After the remand motions were filed, the foreign
representatives amended 34 of the instant actions in January
2011 to include statutory claims under BVI law for "unfair
preferences" and "undervalue transactions."  These claims target
transfers made within the vulnerability period under BVI law.
Nevertheless, the essential facts to be determined are identical
to the state-law claims for mistaken payment.

On May 23, 2011, the bankruptcy court denied the
remand motion.  Fairfield III, 452 B.R. at 69.  The bankruptcy

4

court ruled that it had "core" bankruptcy jurisdiction under 28 U.S.C. § 1334(a) "over the BVI Avoidance Claims in particular, and the Actions as a whole" because they "directly affect[] this Court's core bankruptcy functions under chapter 15." Id. at 74; see id. at 74-82.  In the alternative, the court ruled that it had "related to" jurisdiction because the actions are related to the Plaintiffs' Chapter 15 case.  Id. at 82.  The court also ruled that it would not abstain under either the mandatory or permissive standards.  Id. at 83-86.  It also sua sponte enlarged the time period for removal of the allegedly untimely removed actions.  Id. at 87-91.  This Court granted Defendants' motion for a stay pending leave to appeal on July 14, 2011, and extended that stay at oral argument until a decision on the motion for leave to appeal was rendered.

II. LEAVE TO APPEAL

This Court has discretion to grant an interlocutory appeal of an order of the Bankruptcy Court.  28 U.S.C. § 158(a)(3).  In exercising that discretion, courts have looked for guidance to 28 U.S.C. § 1292(b) and have granted such leave where (a) the order involves a controlling question of law; (b) there is a substantial ground for difference of opinion; and (c) an immediate appeal may materially advance the ultimate termination of the litigation.  In re Adelphia Commc'ns Corp., 333 B.R. 649, 658 (S.D.N.Y. 2005).  "[T]he 'question of law'

must refer to a 'pure' question of law that the reviewing court could decide quickly and cleanly without having to study the record.  The question must also be 'controlling' in the sense that reversal of the bankruptcy court would terminate the action, or at a minimum that determination of the issue on appeal would materially affect the litigation's outcome." Id. A "'substantial ground for a difference of opinion' must arise out of a genuine doubt as to the correct applicable legal standard relied on in the order.  Substantial ground would exist if the issue is difficult and of first impression." Id. at 658-59.  Normally, leave to appeal is granted where "exceptional circumstances" are present.  Id. at 658.

     This case presents issues of first impression regarding federal subject matter jurisdiction of the bankruptcy courts in a Chapter 15 case.  The issues, as the discussion below shows, are nuanced and difficult, involve a new statutory scheme, and reach questions about the limits of the bankruptcy court's jurisdiction.  There are substantial grounds for differences of opinion not only with respect to the Bankruptcy Court's determinations as to jurisdiction but also with respect to its determination as to abstention.  Moreover, the issues are pure issues of law.  The litigation has barely progressed, and little, if any, discovery has even been conducted.  Fairfield II, 2010 WL 4910119, at *1.  The substantive issues can be

decided on the basis of the amended complaints.  Finally, the
determination of subject matter jurisdiction is not only of
utmost importance in federal court but also would materially
affect the litigation's outcome.  Wynn v. AC Rochester, 273 F.3d
153, 157 (2d Cir. 2001).  In short, leave to appeal is granted
because this case presents the sort of exceptional circumstances
other courts have found when granting such a motion.  See In re
DPH Holdings Corp., 437 B.R. 88, 93-94 (S.D.N.Y. 2010).  The
Court grants Defendants' motions for leave to appeal.

III. MERITS OF THE APPEAL

          On appeal, Defendants' primary argument is that the
Bankruptcy Court erred in determining that it had subject matter
jurisdiction.  First, Defendants argue that there is no "core"
bankruptcy jurisdiction because these actions have no connection
to the United States and are not cases arising "in" or "under"
title 11.  See 28 U.S.C. § 1334(b).  They say that Plaintiffs'
claims are independent of the United States Bankruptcy Code (and
bankruptcy generally) and involve foreign plaintiffs seeking
foreign transfers from foreign entities.  Second, Defendants
argue that the Bankruptcy Court erred in determining that it has
"related to" or "non-core" jurisdiction over these actions.
Defendants also argue that the Bankruptcy Court erred in failing
to abstain from exercising jurisdiction under either the
mandatory or permissive standards governing the decision to

abstain.  Certain Defendants finally argue that the Bankruptcy
Court erred in sua sponte enlarging the time period for filing a
notice of removal.

        After outlining the standard of review and principles
of federal subject matter jurisdiction in the bankruptcy
context, the Court addresses Defendants' arguments in turn,
beginning with "core" jurisdiction.

        A. Standard of Review

        When reviewing a decision of the Bankruptcy Court,
this Court sits as an appellate court.  It reviews the
Bankruptcy Court's conclusions of law de novo but its findings
of fact for clear error.  In re Quigley Co., 449 B.R. 196, 200-
01 (S.D.N.Y. 2010) (citing In re Bayshore Wire Prods. Corp., 209
F.3d 100, 103 (2d Cir. 2000)).  Questions about the Bankruptcy
Court's subject matter jurisdiction and questions of statutory
interpretation are legal questions that are reviewed de novo.
In re Marconi PLC, 363 B.R. 361, 363 & n.2 (S.D.N.Y. 2007).

        B. Legal Landscape of Subject Matter Jurisdiction in
           Bankruptcy Court

        Subject matter jurisdiction over bankruptcy cases is a
creature of statute.  "Statutory interpretation always begins
with the plain language of the statute, which [the Court]
consider[s] in the specific context in which that language is
used, and the broader context of the statute as a whole."  In re

8

Ames Dep't Stores, Inc. (In re Ames II), 582 F.3d 422, 427 (2d
Cir. 2009) (internal quotation marks and citations omitted).
The Court also considers binding precedents that "provide
definitive interpretations of otherwise ambiguous language."
SEC v. Dorozhko, 574 F.3d 42, 46 (2d Cir. 2009).  "Where the
statutory language remains ambiguous, [the Court] resort[s] to
canons of construction and, if the meaning still remains
ambiguous, to legislative history."  Id.

     The district court has "original but not exclusive
jurisdiction of all civil proceedings arising under title 11, or
arising in or related to cases under title 11."  28 U.S.C.
§ 1334(b).  Jurisdiction of the full array of bankruptcy cases
may be referred to the bankruptcy court.  Id. § 157(a).

     To satisfy constitutional limitations on the subject
matter jurisdiction of the Article I bankruptcy courts,
bankruptcy jurisdiction is divided into "core" and "non-core"
jurisdiction.  See 28 U.S.C. § 157; N. Pipeline Constr. Co. v.
Marathon Pipe Line Co., 458 U.S. 50, 84, 87 (1982) (plurality
op.); id. at 91-92 (Rehnquist, J., concurring in the judgment);
Mt. McKinley Ins. Co. v. Corning, Inc., 399 F.3d 436, 447-48 (2d
Cir. 2005).  A bankruptcy court may "hear and enter final
judgments in" all "core" proceedings.  Stern v. Marshall, 131 S.
Ct. 2594, 2603 (2011).  In a non-core case, a bankruptcy court
"may only" submit proposed findings of fact and conclusions of

law to the district court, which may enter final judgment "after reviewing de novo any matter to which a party objects."  Id. at 2604; see 28 U.S.C. § 157(c)(1).

Core claims are those proceedings "arising under title 11" and proceedings that "arise in" cases under title 11.  28 U.S.C. § 157(a)-(b); In re Ames Dep't Stores Inc., No. 06 Civ. 5394, 2008 WL 7542200, at *4 (S.D.N.Y. June 4, 2008).  Cases "arise under" title 11 when the cause of action or substantive right claimed is created by the Bankruptcy Code.  MBNA Am. Bank, N.A. v. Hill, 436 F.3d 104, 108-09 (2d Cir. 2006); see In re Housecraft Indus. USA, Inc., 310 F.3d 64, 70 (2d Cir. 2002). Cases "arise in" a title 11 proceeding if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy."  Baker v. Simpson, 613 F.3d 346, 351 (2d Cir. 2010) (per curiam) (quoting In re Wood, 825 F.2d 90, 97 (5th Cir. 1987)) (internal quotation marks and alteration omitted).  Thus, a claim that is "an essential part of administering the estate" implicates the Bankruptcy Court's core jurisdiction.  In re Ben Cooper, Inc., 896 F.2d 1394, 1400 (2d Cir. 1990).  The Court of Appeals has "held that core proceedings should be given a broad interpretation that is close to or congruent with constitutional limits."  Mt. McKinley, 399 F.3d at 448 (internal quotation marks omitted).

Sixteen different types of matters are listed in the statute, providing a non-exclusive list of what claims are included within the bankruptcy court's core jurisdiction.  28 U.S.C. § 157(b)(2); Stern, 131 S. Ct. at 2603.  However, "the determination of whether a particular proceeding is core or non-core cannot be made by simply consulting that list."  In re Ames, 2008 WL 7542200, at *6.  Whether a claim is core or non-core is determined on a "case-by-case basis by evaluating both the form and the substance of the particular proceeding" under the standards above.  Id.

Non-core claims are those that are "related to" a bankruptcy case.  See 28 U.S.C. § 157(c)(1).  "[A] civil proceeding is 'related to' a title 11 case if the action's outcome might have any conceivable effect on the bankrupt estate."  Parmalat Capital Fin. Ltd. v. Bank of Am. Corp., 639 F.3d 572, 579 (2d Cir. 2011) (internal quotation marks omitted).

C. Core Jurisdiction

Although asserted in several state- and foreign-law guises, all of the claims involved in these cases rest on the same essential theory: redemptions from the Funds prior to the discovery of Madoff's fraud — and prior to the commencement of the BVI liquidation proceedings — were based on inaccurate and falsely inflated calculations of the Funds' NAV because of the fraud.  Therefore, the theory goes, portions of these redemption

payments should be clawed back or rescinded for the benefit of the Funds' now-bankrupt estates because the redemption payments were mistakenly too high.[1]

After reviewing the parties' submissions to the Bankruptcy Court and to this Court, the Court concludes that these cases do not fall within the Bankruptcy Court's core jurisdiction for two reasons.  First, these cases do not "arise under" title 11 nor do they "arise in" a title 11 case.  Second, the assertion of subject matter jurisdiction over these cases by an Article I court contravenes the principle of separation of powers enshrined in Article III of the Constitution.  The Court discusses each of these rationales in turn.

        1.  "Arising Under" Title 11 or "Arising in" a Title 11 Case

             a.  "Arising Under" Title 11

There is no question that the state- and BVI-law claims do not "arise under" title 11.  Neither the causes of

---

[1] The Court need not consider Defendants' argument that it was improper for the Bankruptcy Court in determining whether it had core jurisdiction to have considered the amended BVI-law claims, which were added after Plaintiffs' notice of removal was filed.  See, e.g., Hallingby v. Hallingby, 574 F.3d 51, 56 (2d Cir. 2009) ("[T]he existence of federal subject matter jurisdiction over an action removed from state court to federal court is normally to be determined as of the time of removal . . . .").  Under either the state-law or amended BVI-law claims, the essence of the claims under either state or foreign law is the same.  In any event, consideration of the amended claims was probably improper.

action nor substantive rights claimed in these cases are created
by the Bankruptcy Code.  MBNA, 436 F.3d at 108-09.  They are
created by state and foreign legislatures and involve
independent substantive rights.  Chapter 15 merely gives the
foreign representatives standing to use the United States courts
to assert claims under law other than Chapter 15.  11 U.S.C.
§ 1509(b)(1) (stating that "the foreign representative has the
capacity to sue and be sued in a court in the United States").
In other words, the causes of action asserted here are not
created by Chapter 15; they are asserted in a Chapter 15 case
designed to provide ancillary assistance to a foreign tribunal.
See, e.g., In re JSC BTA Bank, 434 B.R. 334, 341 (S.D.N.Y.
2010).  This much is clear from the face of the complaint, which
contains no cause of action asserted under Chapter 15 yet
several causes of action asserted under state and foreign law.

        The fact that a foreign representative may seek to
assert these causes of action in a Chapter 15 case does not
change anything because Chapter 15 merely does not prohibit the
application of the law as provided by the other sovereign.  See
In re Condor Ins. Ltd., 601 F.3d 319, 327 (5th Cir. 2010)
(stating that Chapter 15 does not allow foreign representative
"to gain access to avoidance powers not provided by the law of
the foreign proceeding" unless he files a "full bankruptcy case"
under U.S. law).  This is in keeping with the ancillary

13

character of a Chapter 15 case.  Id. at 322.  Moreover, the fact
that 28 U.S.C. § 157(b)(2)(P) states that "recognition of
foreign proceedings and other matters under chapter 15 of title
11" are core proceedings is not relevant to the determination
necessary here.  That provision, at minimum, ensures that the
recognition proceeding itself is a core proceeding; whether
another proceeding in the Chapter 15 context is core must be
determined by the law governing federal subject matter
jurisdiction over bankruptcy cases.  See, e.g., 28 U.S.C.
§ 157(b)(3) (core determination "shall not be made solely on the
basis that [a claim's] resolution may be affected by State
law"); In re U.S. Lines, Inc., 197 F.3d 631, 637 (2d Cir. 1999);
In re Ames, 2008 WL 7542200, at *6.

> b.  "Arising in" a Case Under Title
>       11

That these cases do not "arise under" title 11 does
not end the inquiry.  The Court also must determine whether
these causes of action "arise in" a title 11 case.  First, the
Court determines whether there is a statutory basis for subject
matter jurisdiction.  Then the Court considers whether the form
and substance of the claims falls within the bankruptcy court's
core jurisdiction.

i. <u>Statutory Basis</u>

Aside from recognition of a foreign proceeding, "other matters under chapter 15 of title 11" are core proceedings under the statute.  28 U.S.C. § 157(b)(2)(P).  While the statute provides for certain automatic relief, such as the operation of the automatic stay on assets of the foreign debtor located within the territorial jurisdiction of the United States, 11 U.S.C. § 1520(a), the foreign representatives seek discretionary relief under 11 U.S.C. § 1521(a), entitled "Relief that may be granted upon recognition."  Section 1521(a) provides:

> (a) Upon recognition of a foreign proceeding, whether main or nonmain, where necessary to effectuate the purpose of this chapter and to protect the assets of the debtor or the interests of the creditors, the court may, at the request of the foreign representative, grant any appropriate relief, including--
>
> (1) staying the commencement or continuation of an individual action or proceeding concerning the debtor's assets, rights, obligations or liabilities to the extent they have not been stayed under section 1520(a);
>
> (2) staying execution against the debtor's assets to the extent it has not been stayed under section 1520(a);
>
> (3) suspending the right to transfer, encumber or otherwise dispose of any assets of the debtor to the extent this right has not been suspended under section 1520(a);
>
> (4) providing for the examination of witnesses, the taking of evidence or the delivery of information concerning the debtor's assets, affairs, rights, obligations or liabilities;

(5) entrusting the administration or realization of all or part of the debtor's assets within the territorial jurisdiction of the United States to the foreign representative or another person, including an examiner, authorized by the court;

(6) extending relief granted under section 1519(a); and

(7) granting any additional relief that may be available to a trustee, except for relief available under sections 522, 544, 545, 547, 548, 550, and 724(a) [of title 11].

In the alternative, the foreign representatives seek relief under 11 U.S.C. § 1507(a), which states, "Subject to the specific limitations stated elsewhere in this chapter the court, if recognition is granted, may provide additional assistance to a foreign representative under this title or under other laws of the United States."

The Bankruptcy Court's holding was premised primarily on its finding of core jurisdiction under sections 1521(a)(5) and (a)(7), Fairfield III, 452 B.R. at 76, 79, and none of the other sections applies on its face.  The Court thus follows the Bankruptcy Court's lead.

Section 1521(a)(5) cannot be the basis for concluding that core jurisdiction exists, although it is the sole basis for the relief Plaintiffs' seek included by Plaintiffs in the amended complaints.  These actions seek to recover certain asset transfers from the foreign debtors and therefore "realiz[e]"

assets of the foreign debtor, but section 1521(a)(5) contains a specific territorial limitation.  The court may entrust the "realization of all or part of the debtor's assets <u>within the territorial jurisdiction of the United States</u>."  11 U.S.C. § 1521(a)(5) (emphasis added).  "Within the territorial jurisdiction of the United States . . . refers to tangible property located within the territory of the United States and intangible property deemed under applicable nonbankruptcy law to be located within that territory . . . ."  <u>Id.</u> § 1502(8).  The foreign representatives seek recovery of foreign assets by challenging foreign transfers.  In these cases, there are no assets sought "within the territorial jurisdiction of the United States."  Nowhere in the complaints, Plaintiffs' papers, Defendants' papers, or at oral argument can there be found a nonfrivolous reference to any assets sought that are located within the territorial jurisdiction of the United States or in possession of a U.S. domiciled defendant.[2]  At oral argument, the

---

[2] The Plaintiffs' suggestion that the Chapter 15 cases themselves satisfy the requirements of section 1521(a)(5) is incorrect.  For one thing, the actions are intangible assets, which are located where the plaintiff is domiciled.  <u>Delaware v. New York</u>, 507 U.S. 490, 503 (1993) (location of corporation's intangible asset is place of incorporation).  Here, Plaintiffs are domiciled in the BVI, so the intangible assets are located there.  For another thing, this is not a case where Plaintiffs are seeking assets from a United States domiciliary or involving assets located within the United States.  <u>Cf.</u> <u>Parmalat</u>, 639 F.3d at 576-77 (U.S.-based assets sought by foreign trustee).  The (cont'd . . .)

assumption of all of the parties was that no tangible assets were located in the United States, and at no time did any party proffer a suggestion of assets sought within the United States.[3] Indeed, in at least some cases, the direct or indirect sale of the Funds' shares to U.S. residents or citizens was prohibited by the express terms of the offering documents.  Therefore, section 1521(a)(5) is unavailable to confer core jurisdiction upon the Bankruptcy Court.

Plaintiffs and the Bankruptcy Court rely heavily on section 1521(a)(7) as a basis for core jurisdiction in these cases.  Section 1521(a)(7) is a catchall provision that allows the bankruptcy court to grant "any additional relief that may be

only connection to the United States is the filing of the lawsuits here, and "the bankruptcy court does not have summary jurisdiction to enforce a chose in action against the bankrupt's obligor, even when the bankrupt's rights seem clear." In re Lehigh & Hudson River Ry. Co., 468 F.2d 430, 433 (2d Cir. 1972). Thus, Plaintiffs may not manufacture jurisdiction by the expedient of filing a lawsuit in the United States.

[3] When asked whether there were assets in the United States, Plaintiffs suggested that because Defendants are subject to personal jurisdiction in the United States (but not in the BVI), the Bankruptcy Court has jurisdiction to hear Plaintiffs' claim.  This argument belies a misunderstanding of federal jurisdictional concepts.  Subject matter jurisdiction does not exist because personal jurisdiction exists. Ins. Corp. of Ireland, Ltd. v. Compagnie des Bauxites de Guinee, 456 U.S. 694, 701-02 (1982).  The two jurisdictional requirements are separate. Id.  Even if Defendants subjected themselves to personal jurisdiction in the United States as Plaintiffs argue, subject matter jurisdiction still must be shown affirmatively; "no action of the parties can confer subject-matter jurisdiction upon a federal court." Id. at 702.

available to a trustee" aside from the relief listed in the
prior sections of section 1521(a).  However, section 1521(a)(7)
limits this grant of authority in an important way.  The foreign
representative may not employ U.S.-law avoidance powers listed
in the enumerated Bankruptcy Code sections unless he files a
plenary U.S. bankruptcy case under Chapter 7 or 11 within a
Chapter 15 case.  In re Condor, 601 F.3d at 322-23.  The ability
to file a plenary case within a Chapter 15 case is provided in
sections 1523(a) and 1528.

     Plaintiffs say that although a trustee may not assert
avoidance powers under U.S. law, 1521(a)(7) allows the foreign
representatives to assert avoidance actions based on foreign
law.  They look to In re Condor as support for their position
because it held that "[w]hatever its full reach, Chapter 15 does
not constrain the federal court's exercise of the powers of
foreign law it is to apply."  Id. at 324.  Specifically,
"section 1521(a)(7) does not exclude avoidance actions under
foreign law."  Id.  Because Plaintiffs say these cases are
avoidance actions under BVI law, they say that the claims may be
adjudicated by a federal court.

     Defendants take a different and more nuanced view.
They argue that as an ancillary case, Chapter 15 is different
from a plenary case because the United States courts do not
assert universal jurisdiction over the debtors' assets.  They

argue that the statutory text, structure, and purpose of Chapter 15 suggest that Congress intended to limit the foreign representative's ability to obtain relief against assets to those cases involving assets within the territorial jurisdiction of the United States.  Defendants distinguish <u>In re Condor</u> on the basis that it dealt with the application of foreign avoidance law to the debtor's assets within the territorial jurisdiction of the United States, a situation not present here.

Resolving this dispute requires some explication. Chapter 15 cases are "ancillary" cases.  In such a case, a United States bankruptcy court acts "in aid of the [foreign] main proceedings" to avoid "a system of full bankruptcies . . . in each state where assets are found."  H.R. Rep. No. 109-31(I), at 108 (2005), <u>reprinted in</u> 2005 U.S.C.C.A.N. 88, 171.  Thus, a Chapter 15 court in the United States acts as an adjunct or arm of a foreign bankruptcy court where the main proceedings are conducted.  8 Collier on Bankruptcy ¶ 1501.01 ("Chapter 15 cases are generally intended to be supplementary to cases brought in the debtor's home country.").  The purpose is to maximize assistance to the foreign court conducting the main proceeding. See <u>In re Condor</u>, 601 F.3d at 329.

Nevertheless, Chapter 15 cases differ from plenary bankruptcy cases in at least one significant respect.  While plenary cases in the United States assert universal jurisdiction

over a debtor's assets, Chapter 15 ancillary cases assert only
territorial jurisdiction over a debtor's assets located here.[4]
See In re JSC BTA Bank, 434 B.R. at 341; H.R. Rep. No. 109-
31(I), at 96, 2005 U.S.C.C.A.N., at 181 (stating that unlike
worldwide jurisdiction in a plenary case, in a Chapter 15 case,
"the United States is acting solely in an ancillary position, so
jurisdiction over property is limited to that stated in chapter
15"); 8 Collier on Bankruptcy ¶ 1502.01[8] (distinguishing
"ancillary cases under chapter 15 from cases under other
chapters where the United States asserts insolvency jurisdiction
over property outside its territorial limits"); id. ¶ 1521.04
("Like a chapter 15 case, [a foreign non-main proceeding] is
territorial and confined to assets within its territory.").
This in keeping with both the ancillary function of a United
States court in a cross-border proceeding and the in rem nature

---

[4] Indeed, "[i]n most instances, . . . in Chapter 15
cases, the U.S. courts assert jurisdiction over only those
assets of the foreign debtor that are located in the U.S."
Susan Power Johnston, "Conflict Between Bankruptcy Code
§§ 109(a) and 1515: Do U.S. Bankruptcy Courts Have Jurisdiction
over Chapter 15 Cases if the Foreign Debtor Has No Assets or
Presence in the U.S.?," 17 J. Bankr. L. & Prac. 5, art. 6 (Aug.
2008); accord Comment, "COMI Strikes a Discordant Note: Why U.S.
Courts Are Not in Complete Harmony Despite Chapter 15
Directives," 27 Emory Bankr. Dev. J. 117, 159 (2010) ("It is
equally clear that a proceeding under chapter 15, or the Model
Law, does not purport to affect all of the debtor's assets, only
the local ones.").

of a bankruptcy case.[5]   See In re JSC BTA Bank, 434 B.R. at 342,
344; 8 Collier on Bankruptcy ¶ 1502.01[8] ("[C]hapter 15, and
the Model Law, intend that ancillary cases be limited to
property within the recognizing country.").

     The situation presented in this case cuts against the
grain of Chapter 15's text, structure, purpose, the legislative
history, and prior case law.  Moreover, current case law is
consistent with prior case law and Defendants' interpretation.
The Court explains.

     First, section 1521(a)(7) provides for any relief that
would be "available to a trustee."  However, section 1521(a)(7)
itself prohibits the use of avoidance powers under United States
law as a trustee normally would.  A foreign representative is
only permitted U.S.-law avoidance powers when he commences a
plenary bankruptcy case within a Chapter 15 case.  In such a
case, the application of United States law, which ordinarily

---

[5] This is not to say that all Chapter 15 cases require
assets of the debtor in the United States.  To the contrary,
section 1521(a)(4), for example, allows for discovery in the
United States whether or not a debtor has assets here.  In
addition, section 1521(a)(1) allows a court to stay a proceeding
(clearly in the United States or else a U.S. court would have
such power) that would affect the assets of the debtor, no
matter where they are located.  See Johnston, supra (listing
scenarios where assets in the United States not required to
obtain legitimate relief).  Nevertheless, when the relief sought
in a Chapter 15 case acts directly upon the assets sought, the
assets must be within the territorial jurisdiction of the United
States.  As explained infra, the same result obtained under
section 304, the precursor to Chapter 15.

applies universally, is limited to assets "within the
territorial jurisdiction of the United States."  11 U.S.C.
§ 1528.  If foreign law is used and applied without regard to
territorial limitations, it would provide an end-run around this
limited procedure that is "available to a trustee."  It is
highly unlikely that the classic core bankruptcy matter in a
Chapter 15 case, a plenary case within a Chapter 15 case, is
limited to assets within the territorial jurisdiction of the
United States, while a case with no ties to the United States
aside from the assertion of a lawsuit here is not so limited,
especially when jurisdiction is uncertain.  Although this
situation is not necessarily contrary to congressional intent,
the Court is dealing only with the question of whether section
1521(a)(7) confers core jurisdiction on these proceedings.  "It
is beyond dispute that only Congress is empowered to grant and
extend the subject matter jurisdiction of the federal judiciary,
and that courts are not to infer a grant of jurisdiction absent
a clear legislative mandate."  Pressroom Unions-Printers League
Income Sec. Fund v. Cont'l Assur. Co., 700 F.2d 889, 892 (2d
Cir. 1983).

        Second, all of the provisions in Chapter 15 dealing
directly with relief as to assets — section 1520 (automatic stay
on only U.S. assets), section 1521(a)(5) (realization of only
U.S. assets), and section 1528 (plenary proceeding in a Chapter

15 case limited to only U.S. assets), among others — are limited to assets within the territorial jurisdiction of the United States. <u>E.g.</u>, <u>In re JSC BTA Bank</u>, 434 B.R. at 345.  Those provisions are in keeping with the intent and structure of Chapter 15 ancillary proceedings, as outlined in the commentary on the statute and cited above.  And when relief against assets is sought (as opposed to discovery, stays, and the like), the location of those assets is central to the Chapter 15 analysis. <u>See</u> <u>id.</u> at 344 ("[J]urisdiction over the debtor may only be exercised on the basis of the assets of the debtor."); <u>In re Kingscroft Ins. Co.</u>, 138 B.R. 121, 126-27 (Bankr. S.D. Fla. 1992) ("If the petition requested this Court to marshall [sic] Petitioners' assets, or to turn property over to foreign authorities, the analysis of the presence of assets would be appropriate . . . .").

Importantly, the specific provision most directly applicable to these claims, section 1521(a)(5), is limited to assets "within the territorial jurisdiction of the United States."  It is a basic tenet of statutory interpretation that a "statute which addresses the matter in specific terms controls over a statute which addresses the issue in general terms, unless Congress has manifested a contrary aim." <u>Greene v. United States</u>, 79 F.3d 1348, 1355 (2d Cir. 1996).  Although these provisions do not necessarily conflict, it would be quite

odd that a catchall provision provides for greater authority than the specific provision providing for the relief sought.

Third, as explained above, Chapter 15's position and structure in the international bankruptcy context does not contemplate jurisdiction over assets located abroad.  E.g., 8 Collier on Bankruptcy ¶ 1521.04.  The purpose of an ancillary proceeding is to provide assistance to a foreign representative in a country where the foreign court may not have jurisdiction to prevent debtors from hiding assets.  Chapter 15 is analogous to what it calls "foreign nonmain proceedings."  Id.  These proceedings are territorial and are not designed to have extraterritorial effect.  Id. ¶ 1502[2].

Fourth, the legislative history is clear that in a Chapter 15 case, "the United States is acting solely in an ancillary position, so jurisdiction over property is limited to that stated in chapter 15."  H.R. Rep. No. 109-31(I), at 96, 2005 U.S.C.C.A.N., at 181 (emphasis added).

Fifth, the Chapter 15 case law is consistent with the territorial application of foreign law.  The only reported case dealing with the application of foreign avoidance law in a Chapter 15 case is In re Condor.  Although it is true, as Plaintiffs point out, that this case held that a Chapter 15 "court has authority to permit relief under foreign avoidance law," 601 F.3d at 329, Plaintiffs' understanding does not

25

account for the context of the case.  In re Condor involved a
situation where the foreign debtor allegedly fraudulently
transferred $313 million in assets to an affiliate with United
States locations.  Fogerty v. Condor Guaranty Inc., 411 B.R.
314, 316 & n.3 (S.D. Miss. 2009), rev'd sub. nom. In re Condor
Ins. Ltd., 601 F.3d 319.  Thus, the assets claimed were located
within the territorial jurisdiction of the United States, id.
("many of the assets are now located in the United States"), and
the court permitted the use of foreign avoidance law to seek to
return those assets to the debtor's estate for distribution to
creditors.  The In re Condor court specifically mentioned the
purpose of Chapter 15 in coming to its holding.  It stated that

> Congress did not intend to restrict the powers of the
> U.S. court to apply the law of the country where the
> main proceeding pends.  Refusing to do so would lend a
> measure of protection to debtors to hide assets in the
> United States out of the reach of the foreign
> jurisdiction, forcing foreign representatives to
> initiate much more expansive proceedings to recover
> assets fraudulently conveyed, the scenario Chapter 15
> was designed to prevent.

601 F.3d at 327.  The purpose of Chapter 15 is to disallow
debtors from squirreling away assets in the United States
outside of the reach of the foreign jurisdiction.  In re Condor
does not address the scenario here, where no assets sought are
located within the territorial jurisdiction of the United
States.  It does not apply in this context, and it does not
support Plaintiffs' view of section 1521(a)(7) in this case.

Sixth, the law under the predecessor to Chapter 15, section 304, did not allow jurisdiction over claims to assets where no assets were located within the territorial jurisdiction of the United States.  Chapter 15 does not "expand or reduce the scope of relief" that was available under prior law.  H.R. Rep. No. 109-31(I), at 92, 2005 U.S.C.C.A.N., at 178.  Indeed, "Congress intended that case law under section 304 apply unless contradicted by Chapter 15."  In re Condor, 601 F.3d at 328. Under prior law, courts did not permit section 304 relief to realize assets where the debtor had no assets in the United States.[6]  E.g., In re Goerg, 844 F.2d 1562, 1568 (11th Cir. 1988) ("In aid of such proceedings, federal bankruptcy courts may, within the constraints imposed by section 304, apply their processes and expertise to marshal property of the foreign debtor's estate located in this country." (emphasis added)); In re Treco, 227 B.R. 343, 349-50 (Bankr. S.D.N.Y. 1998) (requiring that remedy sought by foreign representative "directly or indirectly affect[] the foreign debtor's property in the United States"); In re Phoenix Summus Corp., 226 B.R. 379, 381 (Bankr. N.D. Tex. 1998) ("The entire tenor of § 304 is that the Debtor

---

[6] Unsurprisingly, In re Metzler, upon which Plaintiffs rely, was a case just like In re Condor.  There, the court held that a section 304 proceeding may provide relief under foreign law to seek avoidance of transfers that occurred within the United States.  78 B.R. 674, 677 (Bankr. S.D.N.Y. 1987).

in the foreign proceeding have some property in the United States which needs to be administered or protected for the benefit of creditors. . . . Since [the debtor] has no property in the United States, . . . the court has difficulty seeing any need for an ancillary bankruptcy proceeding."). The same result obtains under Chapter 15. Moreover, like section 1521(a)(1) and (a)(4), ancillary proceedings to enjoin lawsuits or in aid of discovery under section 304 were not premised on the presence of property within the United States. E.g., Haarhuis v. Kunnan Enters., Ltd., 177 F.3d 1007, 1010-12 (D.C. Cir. 1999) (injunction of suit), In re Kingscroft, 138 B.R. at 126-27 (same); In re Gee, 53 B.R. 891, 898 (Bankr. S.D.N.Y. 1987) (discovery). However, as in Chapter 15, the situation is different where the foreign representative seeks an order to turn over or realize assets.[7] See In re Kingscroft, 138 B.R. at 126; see also Haarhuis, 177 F.3d at 1012 ("[Section 304(b)(2)] also appears to contemplate assets in the United States; again, a United States court cannot order the turnover . . . of property over which it has no jurisdiction."). Then assets must be located within the bankruptcy court's jurisdiction. That is

---

[7] Where assets were at issue, the jurisdictional limitations applied under prior law because "[t]he ultimate purpose of the section 304 mechanism is to prevent dismemberment by local creditors of assets located in this country that are involved in a foreign insolvency proceeding." In re Goerg, 844 F.2d at 1568.

because, like any bankruptcy case, ancillary proceedings are fundamentally in rem proceedings.[8]  In re JSC BTA Bank, 434 B.R. at 344.  The same reasoning applies here.  Where no assets are located within the territorial jurisdiction of the United States and the foreign representative seeks an order of the court that acts upon assets, at least core jurisdiction does not lie.  In re Treco, 227 B.R. at 349-50.

Here, there are no assets in the United States.  The Plaintiffs' actions seek assets, so their location is relevant.  Plaintiffs do not seek discovery or stays of proceedings in the United States.  Thus, the ancillary character of the Chapter 15 cases here is at a low ebb — it is certainly not within the core jurisdiction of the bankruptcy court to aid the BVI courts in these cases because there are no assets sought in the United States.  Thus, for the six reasons stated, the bankruptcy court does not have core jurisdiction under section 1521(a)(7).[9]  For

_____

[8] In fact, practically speaking, all of the relief permitted by the statute involves something over which the bankruptcy court has jurisdiction, be it witnesses, 11 U.S.C. § 1521(a)(4), other court proceedings, id. § 1521(a)(1), or property, id. § 1521(a)(5).  However, where the issue is property, principles of in rem jurisdiction command that the court have jurisdiction over the res.

[9] The Court does not address Defendants' argument that 11 U.S.C. § 546(e) deprives the bankruptcy court of the ability to grant relief in these cases and, thus, of subject matter jurisdiction because there is no basis to find subject matter jurisdiction on other grounds.  Moreover, it is not clear that (cont'd . . .)

the same reasons, the Court rejects Plaintiffs' argument that the expansive personal jurisdiction of the United States courts is a sufficient nexus to the United States to be of aid in obtaining assets for the BVI courts and thus confers core jurisdiction.  Section 1521(a)(7) does not confer core jurisdiction on the Bankruptcy Court.

This does not bring the Court to the end of the statutory journey.  Like the Bankruptcy Court, Plaintiffs also point to other statutory bases for core jurisdiction, focusing on those situations listed in 28 U.S.C. § 157 in this effort.  This approach is unavailing.  The claims are not "orders to turn over property of the estate," id. § 157(b)(2)(E), because an "action for turnover of property is core when its purpose is the collection rather than the creation, recognition or liquidation of a matured debt.  Numerous courts have therefore held that an action is non-core when property which is the subject of a significant dispute between the parties is sought to be recovered through a turnover action."  In re CIS Corp., 172 B.R. 748, 759 (S.D.N.Y. 1994) (internal citation and quotation marks

_____

section 546(e) is a jurisdictional statute.  In other contexts, the Supreme Court has cautioned that "when Congress does not rank a statutory limitation on coverage as jurisdictional, courts should treat the restriction as nonjurisdictional in character."  Arbaugh v. Y&H Corp., 546 U.S. 500, 515-16 (2006). In any event, anticipated defenses are not a basis to find federal subject matter jurisdiction.  Sullivan v. Am. Airlines, Inc., 424 F.3d 267, 271 (2d Cir. 2005).

omitted); see Weiner's, Inc. v. T.G. & Y. Stores Co., 191 B.R.
30, 32 (S.D.N.Y. 1996).  These actions are subject to
significant dispute, resolution of which will determine whether
the funds redeemed are in fact property of the Funds' estates.
See In re DHP Holdings II Corp., 435 B.R. 220, 229 (Bankr. D.
Del. 2010).  They are not core claims under section
157(b)(2)(E).

        Similarly, the Court rejects Plaintiffs' argument that
these cases concern "the administration of the estate" under
section 157(b)(2)(A) or are proceedings "affecting the
liquidation of the assets of the estate" under section
157(b)(2)(O).  Both of those sections require the existence of a
bankruptcy estate, which is not created in a Chapter 15
proceeding.  In re JSC BTA Bank, 434 B.R. at 341.  "Chapter 15
cases are specialized proceedings unlike plenary cases commenced
under the Bankruptcy Code," id., in part because unless the
foreign representative commences a U.S. bankruptcy case within
its Chapter 15 case, 11 U.S.C. § 1523, the bankruptcy court acts
as an ancillary court, applying only foreign law with "no
opportunity to gain the powers of avoidance" provided by U.S.
bankruptcy law, In re Condor, 601 F.3d at 327.  Moreover, even
though Plaintiffs' claims, if successful, would inure to the
benefit of the Funds' foreign estates, the mere fact that
recovery would benefit the foreign estate is not sufficient to

confer core jurisdiction under these sections, contrary to
Plaintiffs' assertions.  See In re Orion Pictures Corp., 4 F.3d
1095, 1101 (2d Cir. 1993); In re Durso Supermkts., Inc., 170
B.R. 211, 214 (S.D.N.Y. 1994).  This reasoning has been squarely
rejected as not supporting core jurisdiction for constitutional
reasons, see In re Orion, 4 F.3d at 1101 and discussed infra,
and, at most, supports "related to" jurisdiction.  See Parmalat,
639 F.3d at 579.

ii. Nature of Claims

        With no basis provided by statute for core
jurisdiction, the only other basis for core jurisdiction would
be a determination that form and substance of the claims
implicates the bankruptcy court's core jurisdiction.[10]  In re
Ames, 2008 WL 7542200, at *6.  In other words, the question is
whether the claims would have "no existence" outside of
bankruptcy, Baker, 613 F.3d at 351, or are "an essential part of
administering the estate," In re Ben Cooper, 896 F.2d at 1400.

---

        [10] Plaintiffs' reliance on the catchall provisions of
Chapter 15 as a basis for core jurisdiction is unfounded.  See
11 U.S.C. § 1507 (stating that court "may provide additional
assistance to a foreign representative"); id. § 1521(a) (stating
that court may provide "any appropriate relief" that is
"necessary to effectuate the purpose" of Chapter 15).  Given
that the specific statutory provisions do not provide core
jurisdiction, these general provisions, even if "exceedingly
broad," In re Atlas Shipping A/S, 404 B.R. 726, 739 (Bankr.
S.D.N.Y. 2009), do not provide a basis for jurisdiction in view
of the discussion that follows.

Looking at the form and substance of the claims asserted in these cases, the claims exist independently of the bankruptcy. Plaintiffs' claims amount to standard common law claims for money had and received, mistaken payment, or unjust enrichment. The essence of Plaintiffs' claim is that the redemption payments were too high and "generally represent assets of [the Funds'] estates that Defendants are not entitled to keep." (Declaration of Kathleya Chotiros dated June 6, 2011, Ex. C ("First Amended Compl.") ¶ 59.)[11] Plaintiffs claim that when the Funds made withdrawals from their accounts with BLMIS to pay investors for shares redeemed from the Funds, the pro rata shares of assets paid out to the redeeming shareholders were miscalculated because of the Madoff fraud, and amounts paid out were not the proceeds of securities or investments but, rather, proceeds of an ongoing Ponzi scheme. (Id. ¶¶ 5-7.) Because the Funds' assets were squandered in this scheme, the Funds do not have sufficient assets to satisfy their liabilities, including liabilities to the trustee in the BLMIS liquidation. (Id. ¶ 12.) Plaintiffs assert their causes of action to claw back the redemption payments from the Defendants

---

[11] Each action has its own complaint with minor differences. The parties ascribe no meaning to these differences, and the Court finds no material differences in the complaints for jurisdictional purposes. Therefore, references to this example complaint are used throughout for consistency.

and, in turn, the beneficial shareholders of the Funds. (Id. ¶¶ 60-121.)  The claims under the BVI Insolvency Act are merely money had and received claims asserted under the BVI statute.

The fact that these claims are independent is, in some senses, obvious.  The redemptions at issue occurred well before the Funds' bankruptcy.  The state-law claims at issue here were asserted well before any Chapter 15 case was commenced and could have proceeded in the state courts.  Plaintiffs demanded a jury, which is probative of the non-core nature of these claims.  See Langenkamp v. Culp, 498 U.S. 42, 45 (1990) (per curiam); In re Ames II, 582 F.3d at 431 n.5.  In the BVI proceedings, analogous claims proceeded there prior to the filing of the Chapter 15 cases.  The filing of the Chapter 15 cases in no way limited the foreign representatives' ability to proceed in those fora and, indeed, solidified their standing to sue in the courts of this country.  11 U.S.C. § 1509(b).  Had the foreign representatives declined to file a Chapter 15 case, that choice also would not have limited the foreign representatives' ability to pursue their claims in the United States.  Id. § 1509(f) ("Notwithstanding any other provision of this section, the failure of a foreign representative to commence a case or to obtain recognition under this chapter does not affect any right the foreign representative may have to sue in a court in the

United States to collect or recover a claim which is the
property of the debtor.").

All of these considerations lead to a conclusion that
the claims are non-core.  "In determining whether a contract
dispute such as the one in this lawsuit is core, [the Court
looks] to (1) whether the contract is antecedent to the
reorganization petition; and (2) the degree to which the
proceeding is independent of the reorganization." Mt. McKinley,
399 F.3d at 448 (internal quotation marks omitted).  The facts
in dispute occurred well before any bankruptcy petition, and the
contracts were antecedent to the bankruptcy.  That much is
obvious from the face of the complaints and cuts against
Plaintiffs' assertion that this case involves the core
jurisdiction of the bankruptcy courts.  See Beard v. Braunstein,
914 F.2d 434, 443 (3d Cir. 1990) ("It is clear that to the
extent that the claim is for pre-petition contract damages, it
is non-core."); In re Balensweig, 410 B.R. 157, 162-63 (Bankr.
S.D.N.Y. 2008) (stating that tort or contract claims wholly
based on pre-petition events is not core even though it accrued
to the benefit of the estate).

Moreover, the claims are entirely independent of the
bankruptcy, and no bankruptcy-created rights are at issue.  A
practical view helps illustrate the independence of these
claims.  Had the Fund's investments been diversified such that,

say, only 5% of the Funds' assets were "invested" with BLMIS, the BLMIS fraud would have been significant to the Funds' performance but not deadly.  The Funds could have pursued the same claims asserted here in tort and continued about their ordinary business without ever having filed for bankruptcy.  The claims are independent of bankruptcy and involve facts wholly antecedent to the bankruptcy.  They are not core claims.

That said, the urgency of these claw back claims obviously is heightened by the fact that the Funds allegedly "invested" 95% of the money received from the sale of shares with BLMIS (id. ¶ 32) and now cannot pay their liabilities. Although this state of affairs led to the Funds' demise, it does not change the fact that the essence of the claims is not, as the Bankruptcy Court found, traditionally core in nature.  As shown by a review of the operative complaints, these claims are disputes between two private parties that have existed for centuries and are "made of 'the stuff of the traditional actions at common law tried by the courts at Westminster in 1789.'"  See Stern, 131 S. Ct. at 2609 (quoting N. Pipeline, 458 U.S. at 90 (Rehnquist, J., concurring in the judgment)).

The Bankruptcy Court focused on the addition of the BVI-law claims as tipping the balance in favor of core jurisdiction because those claims are "traditionally core in nature." Fairfield III, 452 B.R. at 76.  The addition of these

36

claims, however, does not alter the calculus.  Like the
fraudulent conveyance suits at issue in Granfinanciera, S.A. v.
Nordberg, the BVI claims here are "quintessentially suits at
common law that more resemble state law contract claims brought
by a bankrupt corporation to augment the bankruptcy estate than
they do creditors' hierarchically ordered claims to a pro rata
share of the bankruptcy res."  492 U.S. 33, 56 (1989).  And like
the fraudulent conveyance suits in Granfinanciera, the fact that
these claims can be brought in bankruptcy is not dispositive.
"Legal claims are not magically converted into equitable issues
by the presentation to a court of equity . . . ."  Id. at 52
(quoting Ross v. Bernhard, 396 U.S. 531, 538 (1970)) (alteration
omitted).  The Supreme Court's "decisions establish beyond
peradventure that in cases of fraud or mistake, as under any
other head of chancery jurisdiction, a court of the United
States will not sustain a bill in equity to obtain only a decree
for the payment of money by way of damages, when the like amount
can be recovered at law in an action sounding in tort or for
money had and received."  Id. at 47-48 (internal quotation marks
and alteration omitted).  This is the case here, as the
Bankruptcy Court seems to have recognized.  Fairfield III, 452
B.R. at 78 ("The Common Law Claims and BVI Avoidance Claims seek
recoveries based on the same set of facts for allocation among
the same stakeholders . . . .").  Thus, the addition of the BVI-

law claims does not change the analysis.  The actions do "not arise as part of the process of allowance and disallowance of claims," and they are not "integral to the restructuring of debtor-creditor relations."  Granfinanciera, 492 U.S. at 58. Instead, they focus on whether the redemption payments were proper and may increase the total proceeds available to the Funds' estates, no matter the costume in which the claims arrived.  They therefore are not matters that would not exist outside of bankruptcy and are not core claims.

Plaintiffs' suggestion at oral argument that these cases more closely resemble Katchen v. Landy, 382 U.S. 323 (1966) or Langenkamp v. Culp, 498 U.S. 42, does not withstand scrutiny.  In those cases, the Court allowed voidable preference and preferential transfer claims, respectively, to proceed before a bankruptcy court because creditors had filed claims in bankruptcy against the estate.  Katchen, 382 U.S. at 325; Langenkamp, 498 U.S. at 44.  Plaintiffs say that the shareholders have an automatic claim under BVI law in the BVI liquidation proceeding and may not file a proof of claim because doing so is prohibited by law.  Therefore, they argue that these extant proofs of claim must be adjudicated in the Chapter 15 cases, which makes them core bankruptcy cases because, absent their adjudication, the BVI proceedings cannot be completed. The problem with this argument is that in Katchen and

38

Langenkamp, the claims were filed against a United States-based bankruptcy estate in a United States bankruptcy court regarding United States-based assets.  To adjudicate those bankruptcy cases, the United States bankruptcy court had to determine whether the claims were valid because "the trustee bringing the preference action [in those cases] was asserting a right of recovery created by federal bankruptcy law." Stern, 131 S. Ct. at 2618 (emphasis added).  Thus, they were core claims.

Here, the Chapter 15 proceedings are ancillary to the BVI proceedings.  The right of recovery is not provided by federal bankruptcy law, as shown above.  The purpose of a Chapter 15 case is to aid foreign jurisdictions in administering bankruptcies by preventing debtors from squirreling away assets in the United States.  See In re Condor, 601 F.3d at 327.  It is not to take over as the center stage for the proceedings.  See In re JSC BTA Bank, 434 B.R. at 341.  The cases under the same legal theories could have been (and were) brought in the BVI proceedings.  Fairfield III, 452 B.R. at 78 ("Although arising under neither U.S. nor BVI insolvency statutes, the legal theories asserted in the Common Law Claims are available, and have been employed, in the BVI insolvency proceedings . . . .").  The claims can be adjudicated finally and completely in the BVI, whether or not the U.S. Chapter 15 case is completed or even brought.  The alleged fact that the shareholders have an

automatic claim in the BVI insolvency proceedings is of no moment.  Nothing that happens in the BVI proceedings will determine the fate of any claim in the Bankruptcy Court because no assets exist in the United States for recovery and shepherding to the BVI — the purpose of Chapter 15.[12]  It thus cannot be that an automatic claim under BVI law results in the same situation as in <u>Katchen</u> or <u>Langencamp</u>.  To say that the U.S. proceeding — designed entirely to aid a foreign main proceeding in the recovery of U.S. assets otherwise unobtainable — is a core bankruptcy case stands logic on its head.  The adjudication of these cases, while possibly helpful to the BVI proceedings, is not a core U.S. bankruptcy matter.

### 2. <u>Constitutional Issues</u>

Article III, section 1, of the Constitution states that "[t]he judicial Power of the United States shall be vested in one supreme Court, and in such inferior Courts as the Congress may from time to time ordain and establish."  Bankruptcy courts are not Article III courts.  They are legislatively created Article I courts and differ from Article

---

[12] In any event, the assets sought are not property of the Funds until it is determined whose property they are.  <u>See In re DHP Holdings II Corp.</u>, 435 B.R. at 229.  That determination may be made by a BVI court where the Funds are actually domiciled.  And the "possibility of recovery" that "may affect distributions" in bankruptcy does not transform a state-law claim into a core claim.  <u>See In re Balensweig</u>, 410 B.R. 157, 162-63 (Bankr. S.D.N.Y. 2008).

III courts in important ways.  "Article III protects liberty not only through its role in implementing the separation of powers, but also by specifying the defining characteristics of Article III judges."  Stern, 131 S. Ct. at 2609.  Generally, then, Congress may not "withdraw from judicial cognizance any matter which, from its nature, is the subject of a suit at the common law, or in equity, or in admiralty."  Murray's Lessee v. Hoboken Land & Improvement Co., 59 U.S. (18 How.) 272, 284 (1856).  There is a limited exception to this rule.  Cases involving "public rights" (as opposed to "private rights") are cases that Congress may assign to legislatively created courts.  Stern, 131 S. Ct. at 2610.

The scope of the public rights doctrine is not clearly defined.  In Northern Pipeline, a majority of the Supreme Court held that a debtor's pre-petition breach of contract claim against a creditor that had not filed a claim against the estate could not be heard by a bankruptcy court.  458 U.S. at 84 (plurality op.); id. at 90-91 (Rehnquist, J., concurring in the judgment).  This holding was based in part on the fact that the right sought to be vindicated was "created by state law" and was "independent of and antecedent to the" petition.  Id. at 84 (plurality op.).  Other decisions described the public rights exception as involving disputes "between the Government and persons subject to its authority" as opposed to "the liability

41

of one individual to another under the law." Crowell v. Benson,
285 U.S. 22, 50-51 (1932).  Recently, the Supreme Court
described public rights as those rights "integrally related to
particular federal government action."  Stern, 131 S. Ct. at
2613.  Public rights "depend[] on the will of congress," "flow
from a federal statutory scheme," are "completely dependent upon
adjudication of a claim created by federal law," or are "limited
to a particularized area of the law."  Id. at 2614-15 (internal
quotation marks omitted).  In short, if Congress creates an
independent federal right, it may assign adjudication of that
right to an Article I court.  Where the right exists in the
common law, however, Congress may not constitutionally assign
adjudication of that right to a non-Article III court because
"Congress has nothing to do with it."  Id. at 2614.

        The adjudication of these cases to a final judgment by
an Article I court would violate these principles.  As described
above, the claims in these cases are not independent federal
claims or even independent foreign law claims.  They are classic
common law claims for money had and received or mistaken
payment.  The claims are matters of private right because they
are disputes between two private parties about whether the
redemptions were proper.  The claims have "nothing to do" with a
matter of public right.  See id.  They do not involve ordering
of creditors' claims or other statutory rights; they "resemble

state law contract claims brought by a bankrupt corporation to
augment the bankruptcy estate."[13]  Granfinanciera, 492 U.S. at
56.  Plaintiffs' argument boils down to the assertion that any
recovery will accrue to the benefit of the Funds' bankruptcy
estates.  (Pl. Bankr. Br. dated Nov. 15, 2010 at 8 (stating that
the claims are core "because of the fundamental fact that they
[are] a source of recoveries for distribution to the Debtors'
stakeholders").)  However, Granfinanciera holds that common-law
actions to augment the size of the estate involving disputed
facts to be determined by a jury are not core, as opposed to
actions to divvy up and order claims against the estate, which
are.  492 U.S. at 56; see N. Pipeline, 458 U.S. at 71
("[R]estructuring of debtor-creditor relations, which is at the
core of the federal bankruptcy power, must be distinguished from

_____

[13] The Court's conclusion does not mean that any
foreign-created bankruptcy law action asserted in a Chapter 15
case may not be adjudicated by a bankruptcy court.  To the
contrary, many cases could be, and that is the purpose of
Chapter 15.  See In re Condor, 601 F.3d at 327.  Those cases
would likely include claims against U.S. assets to be ordered by
foreign law among the creditors.  They also would likely include
standard claims by the foreign representative to avoid transfers
in the United States about which there is minimal or no dispute,
as in In re Condor.  The lesson here is that these cases are not
standard foreign-law avoidance claims.  Whether the transfers
themselves were even proper is the subject of the disputes, and
that type of dispute is not a bankruptcy-created but instead a
common law claim.  The disputes are wholly outside the United
States, and they involve assets outside of the United States.
The significant factual disputes involving entirely foreign
issues based on common law theories cannot be assigned by
Congress to an Article I court.

the adjudication of state-created private rights, such as the right to recover contract damages that is at issue in this case.").  Indeed, the Court of Appeals specifically rejected Plaintiffs' reasoning.  It said claims that augment the estate are not ipso facto core because any "contract action that the debtor would pursue against a defendant presumably would be expected to inure to the benefit of the debtor estate."  In re Orion, 4 F.3d at 1102.  Such reasoning "creates an exception to [Northern Pipeline] that would swallow the rule."  Id.

Moreover, these claims, like those in Northern Pipeline, involve a nucleus of fact and contracts entered into before any bankruptcy petition was filed.  458 U.S. at 84 (plurality op.); see In re Orion, 4 F.3d at 1100.  The causes of action accrued before and are independent of a bankruptcy.  Thus, "Congress' authority to control the manner in which that right is adjudicated" is "at a minimum."  N. Pipeline, 458 U.S. at 84.  Pre-petition common law actions for a claim requiring adjudication of factual disputes unrelated to bankruptcy are not core claims.  These claims are private rights because they are "state law action[s] independent of the federal bankruptcy law and not necessarily resolvable by a ruling on the creditor's proof of claim in bankruptcy."  Stern, 131 S. Ct. at 2611.  They

are therefore not core claims and may not be adjudicated by an
Article I court absent consent.[14]

### 3. Conclusion

        The claims asserted do not "arise under" title 11.
They do not "arise in" a title 11 case because there is no
statutory basis for United States bankruptcy jurisdiction here,
and the claims are independent of bankruptcy.  In addition, an
Article I court may not adjudicate these claims to final
judgment without violating the Constitution.  The Court has
considered Plaintiffs' other arguments for core jurisdiction and
finds them to be without merit.  The claims are not within the
bankruptcy court's core jurisdiction.

### D. Non-Core Jurisdiction

        Plaintiffs contend that "related to" non-core
jurisdiction exists in these cases under Parmalat.  That case
held that an ancillary case under section 304 is a case under
title 11 and that "a civil proceeding is 'related to' a title 11
case if the action's outcome might have any conceivable effect

---

[14] The Bankruptcy Court's reliance on efficiency in
administering this case along with the other related BLMIS
bankruptcy matters or consistency with the goals of Chapter 15
is not material to the constitutional calculus.  Stern, 131 S.
Ct. at 2619 ("[T]he fact that a given law or procedure is
efficient, convenient, and useful in facilitating functions of
government, standing alone, will not save it if it is contrary
to the Constitution." (quoting INS v. Chadha, 462 U.S. 919, 944
(1983))).

on the bankrupt estate." 639 F.3d at 578-79 (internal quotation marks omitted). Because a recovery in the ancillary case would have an effect the estate, the case was within the "related to" jurisdiction of the bankruptcy court. Id. at 579. Parmalat also held that it did not matter that there was no estate created in the United States in an ancillary case. Id. Defendants disagree, saying that Parmalat is distinguishable on the basis that it involved a foreign representatives seeking assets in the United States, which is not the case here. Moreover, Defendants posit that there are constitutional infirmities with "related to" jurisdiction in these cases not argued in Parmalat and that the jurisdictional grant in the statute, 28 U.S.C. § 1334(b), does not include Chapter 15 cases within the scope of "related to" jurisdiction.

The Court need not address whether "related to" jurisdiction exists in these cases because even if it does, the Bankruptcy Court must reconsider abstaining from hearing these cases for the reasons that follow.[15]

---

[15] One thing is clear: although Plaintiffs argue that these cases may be related to the separate SIPA litigation pending involving BLMIS, that cannot be. The SIPA litigation is not a title 11 case and, thus, 28 U.S.C. § 1334 confers no jurisdiction over a case "related to" that litigation. See In re W.R. Grace & Co., 591 F.3d 164, 172 (3d Cir. 2009) (stating that "related to" jurisdiction turns on "whether the allegedly related lawsuit would affect the bankruptcy without the intervention of yet another lawsuit").

E. Abstention

Abstention is a statutory requirement in certain cases.  The statute provides:

> Upon timely motion of a party in a proceeding based
> upon a State law claim or State law cause of action,
> related to a case under title 11 but not arising under
> title 11 or arising in a case under title 11, with
> respect to which an action could not have been
> commenced in a court of the United States absent
> jurisdiction under this section, the district court
> shall abstain from hearing such proceeding if an
> action is commenced, and can be timely adjudicated, in
> a State forum of appropriate jurisdiction.

28 U.S.C. § 1334(c)(2).  Thus, abstention is required where (1) the motion to abstain was timely filed, (2) the action is based on state-law claims, (3) the action is non-core, (4) the sole basis for federal jurisdiction is 28 U.S.C. § 1334, (5) an action is commenced in state court, and (6) that action can be timely adjudicated in state court.  In re Adelphia, 285 B.R. at 141.

The first five factors clearly favor Defendants. There is no dispute that Defendants timely filed motions to remand or abstain.  These cases involve the assertion of state-law claims.[16]  As explained in Part III.C. and D., the claims are

---

[16] It is true that the BVI claims were amended to most of the instant cases.  However, those claims were added well after removal and probably should not have been considered in the first instance.  See supra note 1.  The Court makes no determination about that issue, however.  In any case, "[f]or purposes of the applicability of mandatory abstention, . . . the (cont'd . . .)

at best non-core, and the Court assumes for the purposes of this issue only that the claims are non-core.  The sole basis for jurisdiction is under section 1334.  The actions were brought originally in state court (as opposed to many of the other similar actions in the Bankruptcy Court, which were brought there).[17]

The only question is whether these actions can be timely adjudicated in the state courts.  In evaluating whether the cases can be timely adjudicated, the Court of Appeals has instructed courts to review "(1) the backlog of the state court's calendar relative to the federal court's calendar; (2) the complexity of the issues presented and the respective expertise of each forum; (3) the status of the title 11 bankruptcy proceeding to which the state law claims are related; and (4) whether the state court proceeding would prolong the administration or liquidation of the estate." Parmalat, 631

---

salient point is that the . . . action is not based upon any federal cause of action." Von Richtofen v. Family M. Found., Ltd., 339 B.R. 315, 320 n.6 (S.D.N.Y. 2005).  The Court determines that this principle is particularly applicable here because, as explained above, the BVI claims, in essence, are the state-law claims in different dress.  Moreover, the fact that the BVI claims were added to the state-law claims so late in the proceedings (and only after the motions to remand were filed) cuts against Plaintiffs' position that this factor favors them.

[17] In fact, had the foreign representatives simply used the Chapter 15 process before filing any of the actions in state court, none of this expensive jurisdictional litigation likely would have ensued.

F.3d at 580.  Timeliness is case-specific and is "informed by the comparative speeds of adjudication in the federal and state forums" in this Circuit.[18]  Id.  The Court of Appeals, without deciding the question, has suggested that although the party seeking relief ordinarily bears the burden of proof, in this context, that allocation may be "inconsistent with the mandatory nature of abstention."  Id. at 582.

The Bankruptcy Court did not make findings regarding the speed with which that these cases could be heard in state court.  Although there is no reason to doubt that these cases could be consolidated before the same judge they were assigned to the first go-around in the state court and could be moved expeditiously in the Commercial Division of the New York Supreme Court, the Bankruptcy Court must make findings on remand.

The third factor is not relevant because there is no title 11 proceeding ongoing here.

As to the second and fourth factors, the Bankruptcy Court seemed to suggest that because 160 or more other, similar, actions are pending before it, remand of these cases would be inefficient.  It is certainly true that the Bankruptcy Court is

---

[18] That approach is not universal.  "The question is not whether the action would be more quickly adjudicated in [the bankruptcy court] than in state court, but rather, whether the action can be timely adjudicated in the state court."  In re Exide Techs., 544 F.3d 196, 218 n.14 (3d Cir. 2008) (alteration in original) (internal quotation marks omitted).

intimately familiar with the Madoff factual context generally and the other Madoff-related cases. That familiarity may allow for some efficiency gains. However, while this may be true in the abstract, these cases have hardly moved forward, and there is nothing to suggest that the knowledge about Madoff's fraud would at all impact these cases, which do not have to do with the fraud, but, rather foreign redemptions. At most, they would involve whether foreign individuals uninvolved in the Madoff liquidation knew of the fraud. If a trial or other significant discovery is necessary, materials produced could be shared between the courts. Although these cases are procedurally complex, that complexity is solely a result of Plaintiffs' choices. The claims themselves are standard common law claims. They do not involve any specialized expertise in bankruptcy law or any other area; as explained, the BVI claims and the state claims are effectively the same. In fact, the state courts may be better equipped to handle claims for money had and received and the like because such cases are more routine there.[19] The fact that foreign law is involved does not favor either court because experts will be necessary in either forum. Crucially in

---

[19] Many tribunals and judges will hear Madoff-related litigation because the fraud was so expansive. Judge Marrero remanded complex securities and derivative class action claims made against Plaintiffs to state court. See Anwar v. Fairfield Greenwich Ltd., 676 F. Supp. 2d 285 (S.D.N.Y. 2009).

these cases, the issue of personal jurisdiction, which likely
will be heavily contested, has yet to be considered by any
court.

Two important asides.  In this analysis, the <u>effect</u> of
these cases on the BLMIS bankruptcy or other <u>separate</u> but
related cases is not material.  <u>See</u> <u>Parmalat</u>, 639 F.3d at 581.
And the fact that the foreign main proceedings are liquidation,
as opposed to reorganization, cases makes the timeliness
analysis less important.  <u>See</u> <u>In re New 118th LLC</u>, 396 B.R. 885,
894 (Bankr. S.D.N.Y. 2008) ("In an adversary proceeding related
to a [liquidation] proceeding, timely adjudication can be
weighed relatively lightly.") (citation omitted); <u>see also</u> <u>In re</u>
<u>Leco Enters., Inc.</u>, 144 B.R. 244, 252 (S.D.N.Y. 1992) (finding
state courts can timely adjudicate actions "given the lack of
urgency in . . . [liquidation] proceedings").

Mandatory abstention should be reconsidered on remand.
Defendants' argument that permissive abstention should have been
granted is moot because the denial of permissive abstention is
not reviewable on appeal.  <u>Baker</u>, 613 F.3d at 352.

F.  <u>Timeliness of Removal</u>

The Bankruptcy Court excused four removals it
acknowledged were untimely on the basis that accepting these
cases is necessary to promote efficiency in adjudicating these
cases.  <u>Fairfield III</u>, 452 B.R. at 90.  While that may be true,

51

the Bankruptcy Court erred in excusing these removals.

Bankruptcy Rule 9006(b)(1)(1) allows the bankruptcy court to enlarge the time for removal before the time for removal expires <u>sua sponte</u>.  However, after that time period expires, enlargement of the time for removal may be granted "on motion made" if "the failure to act was the result of excusable neglect."  Fed. R. Bankr. P. 9006(b)(1)(2).  In these cases, Plaintiffs made no motion, and the Bankruptcy Court enlarged the time period <u>sua sponte</u> after the time period expired.  Moreover, the Bankruptcy Court made no finding of excusable neglect, saying only that there would be no prejudice to the proceedings. Although enlargement for excusable neglect is a matter of equity, <u>Pioneer Inv. Servs. Co. v. Brunswick Assocs. Ltd. P'ship</u>, 507 U.S. 380, 395 (1993), without <u>any</u> basis to find excusable neglect in the record, the Court cannot conclude that enlargement of the time period was appropriate.  Moreover, while Plaintiffs argue that the bankruptcy court has broad equitable powers under 11 U.S.C. § 105(a) to extend deadlines, "[t]he equitable powers emanating from § 105(a) . . . are not a license for a court to disregard the clear language and meaning of the bankruptcy statutes and rules."  <u>In re Barbieri</u>, 199 F.3d 616, 620-21 (2d Cir. 1999).  In addition, as Defendants argued (and demonstrated in post-argument submissions), parties in bankruptcy routinely move for enlargements of time prior to the

cases.   These specific cases must be remanded because the motions were untimely.

IV. CONCLUSION

For the reasons elucidated above, the Bankruptcy Court's May 23, 2011, order is REVERSED.   The Clerk of the Court is directed to close these appeals, and the matters are remanded to the Bankruptcy Court for further proceedings consistent with this opinion.

SO ORDERED.

Dated:   New York, New York
         September 19, 2011

LORETTA A. PRESKA
Chief U.S. District Judge

53